# United States Court of Appeals
## For the First Circuit

No. 24-1230

ALEXANDER RAHEB,

Plaintiff, Appellant,

v.

DELAWARE NORTH COMPANIES, INC. - BOSTON, d/b/a TD GARDEN;

Defendant, Appellee,

UG2, LLC,

Defendant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. F. Dennis Saylor, IV, U.S. District Judge]

Before

Rikelman, Lynch, and Aframe,
Circuit Judges.

Casby Harrison III, with whom Gerard M. DeCelles and Harrison
Law Associates were on brief, for appellant.
Joseph G. Yannetti, with whom Morrison Mahoney LLP was on
brief, for appellee.

October 31, 2024

**LYNCH**, **Circuit Judge**. In this diversity jurisdiction case under Massachusetts law, the district court entered summary judgment against plaintiff Alexander Raheb on his negligence claim, brought under the special mode-of-operation notice theory, against defendant Delaware North Companies, Inc.-Boston ("Delaware North"). The case arose from Raheb's slip and fall on April 13, 2019, at TD Garden in Boston, owned and operated by Delaware North.

The district court "conclude[d] that the courts of the Commonwealth would not apply the mode-of-operation theory under the circumstances presented here." Raheb v. Delaware N. Cos.-Boston et al., 682 F. Supp. 3d 78, 87 (D. Mass. 2023).

We agree with the district court and affirm.

**I.**

"Because the district court granted summary judgment for [Delaware North], we 'describe the facts giving rise to this lawsuit in a light as favorable to [Raheb] as the record will reasonably allow.'" McCoy v. Town of Pittsfield, 59 F.4th 497, 500 (1st Cir. 2023) (quoting Travers v. Flight Servs. & Sys., Inc., 737 F.3d 144, 145 (1st Cir. 2013)).

The summary judgment record, from which we draw the undisputed facts, included: deposition testimony from Raheb, Raheb's friend Fahim Manzur who witnessed the fall, and employees of Delaware North's contracted cleaning company UG2 LLC ("UG2");

the parties' responses to written interrogatories and requests for admission; the Facility Service Contract between Delaware North and UG2; and, as the district court noted, information about a Delaware North "video of the incident."[1]

On April 13, 2019, Raheb attended a Boston Bruins game at TD Garden, a 19,600-seat sports arena in Boston, Massachusetts, along with three friends, including Fahim Manzur. After entering TD Garden, Raheb and Manzur made their way to their balcony level seats and stopped at a concession stand on the balcony concourse level across from the entrance to their seats. Raheb purchased a hotdog and a beer. Raheb's recollection is the beer was sold in a cup that did not have a lid.[2]

Beer and hotdog in hand, Raheb and Manzur walked through the concourse to their balcony seats. Raheb testified that the concourse was very busy, and he was not greatly impacted in his ability to move through the concourse. About 40 or 50 feet beyond the concession stand, before passing through the entrance to his seat, Raheb slipped and fell on the white tile concourse floor. He landed on his kneecap, rupturing his left quadricep tendon.

---

[1]    The video is not in the record before our Court, so we rely on the district court's summation of it.

[2]    At oral argument, Delaware North conceded that there is nothing in the record as to whether TD Garden sells any drinks with lids or that lids are available for any drinks.

Raheb had to undergo surgery and physical therapy, incurred substantial medical bills, and missed time from work.

Neither Raheb nor Manzur observed any liquids or other hazards on the concourse floor before the fall. After the fall, Manzur saw a "fairly clear" liquid on the ground where Raheb slipped but could not identify its source. At the time when Raheb fell, there were no persons who appeared to be employed by TD Garden around the area.

Raheb alleges that he slipped on this liquid, which Delaware North's video footage shows had been spilled approximately five or six seconds earlier by another patron. That patron had been carrying one cup of beer in each hand, with a sports logo "Terrible Towel" draped over the shoulder, when the towel fell on the floor. The patron handed one cup of beer to another person but kept the other cup in hand as the patron bent down to pick up the towel.

At the time of the incident, Delaware North had a Facility Service Contract with UG2, under which UG2 provided pre-event, event, and post-event cleaning services.[3] During TD Garden

---

[3] Raheb named UG2 as a defendant in the suit below, alleging an identical negligence claim against UG2 as against Delaware North. The district court entered summary judgment for UG2, and Raheb had also appealed this entry in this same appeal, but we granted UG2's motion to be dismissed from the appeal. As UG2 explained, "the Plaintiff's appeal from the District Court's judgment has always been about – and understood by counsel for the parties – to be solely limited to [the] District Court's allowance

events, eight UG2 cleaners were assigned to each of the nine floors of the arena and patrolled the concourse with mops. UG2 also reminded its employees before events of their duty to patrol the concourse to make sure that the floor was not wet. A UG2 employee testified in deposition that "a lot of" spills at TD Garden were caused by customers and that customers had two or three cups in their hands "all the time." Incident reports produced during discovery showed that there had been at least 14 slip-and-fall incidents at TD Garden in the three years before Raheb's fall, though not all were necessarily linked to spilled beverages.

## II.

"We review the district court's entry of summary judgment de novo." McCoy, 59 F.4th at 504. Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see McCoy, 59 F.4th at 504.

The issue before us is whether Raheb may get to a jury on the mode-of-operation notice theory under Massachusetts law. See Butler v. Balolia, 736 F.3d 609, 612 (1st Cir. 2013) ("In diversity jurisdiction, a federal court must draw the substantive

---

of Delaware North's motion for summary judgment as to the Plaintiff's claim(s) against Delaware North."

rules of decision . . . from the law of the forum state."). "The most reliable guide to the interpretation of state law is the jurisprudence of the state's highest court." Id.

In Massachusetts, premises liability in slip-and-fall negligence cases follows the Second Restatement of Torts standard:

> A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he (a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and (b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and (c) fails to exercise reasonable care to protect them against the danger.

Sheehan v. Roche Bros. Supermarkets, Inc., 863 N.E.2d 1276, 1280 (Mass. 2007) (quoting Restatement (Second) of Torts § 343 (1965)). "Under the traditional approach to premises liability," a plaintiff must show that the defendant had "actual knowledge" of the spill or that the spill "had been on the floor so long that the [defendant] should have been aware of the condition" to satisfy prong (a) of the Restatement. Id. at 1280. "In determining whether an owner has actual or constructive notice in slip and fall cases involving vegetable or fruit matter, an emphasis has been placed on the physical characteristics of the substance to determine how long it had been left on the floor." Id. at 1281. The mode-of-operation theory "modifies" prong (a) of the notice requirement of the Second Restatement. Id. at 1287.

- 6 -

The Supreme Judicial Court of Massachusetts ("SJC") first endorsed the mode-of-operation theory in Sheehan, where the plaintiff alleged he had slipped and fallen on a grape "in the front crossing aisle near the customer service counter" in a self-service grocery store. See id. at 1279. In that grocery store, "all grapes were packaged in individually sealed bags, easily opened by the hand, and placed in a wicker basket. The grapes were located on a tiered display table, surrounded by mats, in the produce department." Id. at 1280. The plaintiff could not show that the defendant had actual or constructive notice of the fallen grape and "urge[d] th[e] court to follow a more modern trend and adopt the 'mode of operation' approach to determine premises liability." Id. at 1279. The SJC adopted that approach and denied the defendant's motion for summary judgment because Sheehan had enough evidence to have a jury determine whether the mode-of-operation theory applied. Id. at 1286-87.

Sheehan stated: "[m]odern trends in premises liability" modify the traditional approach "in large part, based on the change in grocery stores from individualized clerk-assisted to self-service operations." Id. at 1281. In a self-service context, "merchandise is easily accessible to customers, which results in foreseeable spillage and breakage" because "customers . . . generally may not be as careful and vigilant as a store owner." Id. at 1282. "Additionally, customers often focus on displayed

items that are arranged specifically to attract their attention, often making them unaware of what might be on the floor." Id.

Following the modern trends, the SJC permitted the question of the applicability of the mode-of-operation theory, so that:

> [t]he plaintiff satisfies the notice requirement if he establishes that an injury was attributable to a reasonably foreseeable dangerous condition on the owner's premises that is related to the owner's self-service mode of operation. This is based on the premise that "the owner of such a self-service establishment has actual notice that his mode of operation creates certain risks of harm to his customers. Since a self-service operation involves the reasonable probability that these risks will occur, these risks are foreseeable."

Id. at 1283 (quoting Pimentel v. Roundup Co., 666 P.2d 888, 891 (Wash. 1983)). Even if the plaintiff satisfies the notice requirement under the mode-of-operation theory, "in order for liability to attach, prongs (b) and (c) [of the Restatement] must also be satisfied." Sheehan, 863 N.E.2d at 1287.

Though a plaintiff can overcome summary judgment by showing that "an unsafe condition on an owner's premises exists . . . resulting from an owner's self-service business or mode of operation, and the plaintiff [had] slip[ped] as a result of the unsafe condition," as had Sheehan, "it . . . [is] the task of the trier of fact to determine whether the owner could reasonably foresee or anticipate that the dangerous condition

- 8 -

regularly occurs and whether the owner took all necessary reasonable precautions commensurate with the risks inherent in a . . . method of operation to protect individuals from such foreseeable risks." Id. at 1286-87.

The SJC provided for a limited extension of the mode-of-operation theory outside of the self-service context in Sarkisian, where the plaintiff brought a negligence claim under that theory for a slip and fall she had incurred at a nightclub. Sarkisian v. Concept Rests., Inc., 32 N.E.3d 854, 855-56 (Mass. 2015). The nightclub had a "wooden dance floor" that was "crowded with dancing patrons, many of whom held drinks as they danced," and "dim lighting . . . accented by strobe lights." Id. at 856. It had two bars on the dance floor, "from which patrons could purchase alcoholic and nonalcoholic beverages served in plastic cups." Id. "Patrons were permitted to consume their beverages on the dance floor or, alternatively, in a lounge area." Id. "[T]he only route of travel to and from the lounge area [was] across th[e] dance floor." Id. at 860. The plaintiff had "traveled up the stairs to the lounge area in search of a friend." Id. at 856. "Unable to locate her friend, she traveled back down the stairs less than one minute later." Id. She then slipped and fell on a wet surface on the dance floor. Id.

In a unanimous opinion, the SJC reversed a grant of summary judgment for the nightclub, holding that the plaintiff had

enough evidence to get to the jury on the applicability of the mode-of-operation theory:

> Here, the nightclub's mode of operation included the sale of beverages in plastic cups from bars located on a dance floor. The patrons were then permitted to dance while holding their beverages. It was reasonably foreseeable that such a mode of operation would result in a recurring theme of cups being jostled and liquid being jettisoned by patrons onto the dance floor. Where that liquid is spilled on a floor, crowded with dancers, in a dimly lit setting with flashing strobe lights, and the only route of travel to and from the lounge area is across that dance floor, common sense tells us that the spill creates an unsafe condition that a patron such as the plaintiff is ill-suited to discern, except, perhaps, by the happenstance of a slip and fall.

Id. at 860 (emphasis added). As part of its reasoning, the SJC emphasized the limited nature of its holding by distinguishing an "establishment in which patrons are permitted to carry their own drinks . . . from a concession stand to their seats at a sporting event":

> At oral argument, the defendant warned of the parade of horribles that would follow such a result. According to the defendant, courts will begin applying the mode of operation approach to any establishment in which patrons are permitted to carry their own drinks, whether they are traveling, for example, from a bar to a table in a restaurant or from a concession stand to their seats at a sporting event. We dispel any such notion. A plaintiff does not get to the jury simply by showing that an establishment sells drinks to patrons who are then allowed to travel about the premises. See Konesky, 144 Conn.App. at 142, 72 A.3d 1152. A plaintiff may get to the

> jury, however, by showing that patrons who wish to travel between the bar and their seats are forced -- as a recurring feature of the mode of operation -- to navigate in the dark through a crowd of dancing people holding plastic cups filled with liquid over a wooden floor. <u>Spillage is conceivable in either circumstance, but only in the latter is the regularity of such spillage tied to the mode of operation in a manner that justifies placing the business on notice of the resulting unsafe condition.</u> See [<u>Chiara</u> v. <u>Fry's Food Stores of Ariz., Inc.</u>, 152 Ariz. 398, 400–401, 733 P.2d 283 (1987)].

<u>Id.</u> at 861 (emphasis added).  In distinguishing the case where a plaintiff simply shows "that an establishment sells drinks to patrons who are then allowed to travel about the premises," the SJC cited <u>Konesky</u> v. <u>Post Rd. Ent.</u> approvingly.  See <u>Sarkisian</u>, 32 N.E.3d at 861 (citing <u>Konesky</u> v. <u>Post Rd. Ent.</u>, 72 A.3d 1152, 1161 (Conn. App. Ct. 2013)).  That case explained that "the mode of operation rule is applied appropriately only when a business employs 'a more specific method of operation <u>within</u>' the general business environment that is distinct from the ordinary, inevitable way of conducting the sort of commerce in which the business is engaged."  <u>Konesky</u>, 72 A.3d at 1159 (quoting <u>Fisher</u> v. <u>Big Y Foods, Inc.</u>, 3 A.3d 919, 928 (Conn. 2010)).  <u>Konesky</u> held that "a nightclub does not create liability under the mode of operation doctrine simply by serving chilled beer. . . . [It] likely could not do business at all if it could not serve cold drinks."  <u>Konesky</u>,72 A.3d at 1161.

In Bowers v. P. Wile's, Inc., 54 N.E.3d 1089 (Mass. 2016), the SJC, in a premises liability slip and fall case, held that there was a genuine dispute of material fact as to whether the mode-of-operation theory applied in another self-service retail context. 54 N.E.3d at 1092. There, the plaintiff "[had] approached [defendant Agway's garden] store on a walkway that r[an] between the parking lot and the store" and had slipped and fallen on a stone. Id. at 1092-93. That stone had migrated from "[t]he six-foot wide gravel area, made up of 'river stones,' [that was] adjacent to th[e] walkway," where Agway "display[ed] landscaping merchandise for sale" that "customers [could] help themselves to." Id. at 1092. "Although Agway [had] considered planting grass in the area, it instead chose to use gravel." Id. at 1093. "Agway was aware that stones could be dislodged by people walking in the gravel area, and could end up on the walkway, creating a potential tripping hazard." Id. "Agway had developed a practice of having employees inspect the walkway to make sure that it was free of stones." Id.

Conceding she could not show that Agway had actual or constructive notice, the plaintiff argued that "Agway had notice that the stone was present because Agway use[d] a self-service gravel area as part of its daily operation, and was aware that customers walking in the area to pick up items for purchase might dislodge stones onto the walkway." Id. at 1092. The SJC held:

> Based on the summary judgment record, there is a disputed question of fact whether Agway's choice of gravel rather than another, non-mobile surface, such as the grass it had considered for its self-service area, which is adjacent to the walkway leading to the main entrance to the store, represents a "particular" mode of operation for the self-service area that makes the recurring hazard of stones on the walkway, after customers have walked through the self-service area, foreseeable. The store manager testified at deposition that Agway maintained an informal policy of having employees check the walkway whenever an employee was outside assisting a customer in the gravel area, or performing other work, approximately every fifteen minutes, at least in part due to concerns that stones might come to rest on the walkway as a result of customers walking in and around the gravel area. Thus, there is a genuine question of material fact whether the risk of dislodged stones from customers walking in the gravel area in order to look at and select items for purchase was not just a "conceivable" risk, but, rather, a recurring risk created by Agway's mode of operation. See Sarkisian, 471 Mass. at 684, 687, 32 N.E.3d 854 (deposition testimony of nightclub manager that "spills on the dance floor are part of the business").

Id. at 1096-97 (footnotes omitted). Bowers cited and quoted Sarkisian in support of its holding. Id. at 1097 (citing and quoting Sarkisian, 32 N.E.3d at 861); see also id. at 1094 ("[A] plaintiff may survive a motion for summary judgment by establishing that a business reasonably should have anticipated that 'its chosen method of operation [would] regularly invite third-party interference resulting in the creation of unsafe conditions,' and that the plaintiff was injured 'after encountering the condition so created.'" (quoting Sarkisian, 32 N.E.3d at 859)). It also

- 13 -

relied heavily on Sheehan's guidance on the applicability of the mode-of-operation theory in the self-service context. See, e.g., id. at 1095 ("The mode of operation approach is based on the theory that customers interacting with products for sale, without the assistance of store employees, 'generally may not be as careful and vigilant as a store owner . . . .'" (quoting Sheehan, 863 N.E.2d at 1282)).

As the district court held, "the language of Sarkisian is explicit," Raheb, 682 F. Supp. 3d at 85 -- "[a] plaintiff does not get to the jury simply by showing that an establishment sells drinks to patrons who are then allowed to travel about the premises" such as "from a concession stand to their seats at a sporting event." Sarkisian, 32 N.E.3d at 861. Raheb has presented no evidence beyond this showing, and we must follow this statement from Massachusetts' highest court.

Raheb argues that he has shown more, that "[d]efendant's mode of operation forced thousands of patrons, including Plaintiff, to walk purposefully through corridors crowded with other patrons carrying open cups of beer over a bright white tile floor that makes spilt beer difficult to observe until after a slip and fall has occurred." But none of these facts distinguish TD Garden from any other "establishment in which patrons are permitted to carry their own drinks . . . from a concession stand to their seats at a sporting event." Sarkisian, 32 N.E.3d at 861.

Raheb also points toward evidence that "customer[-]caused spills occurred 'constantly' during events hosted by Defendant." Nonetheless, "the regularity of . . . spillage [must be] tied to the mode of operation in a manner that justifies placing the business on notice of the resulting unsafe condition." Sarkisian, 32 N.E.3d at 861. In Sarkisian, the SJC held that on the facts there, the regularity of spillage was so tied to the mode of operation, where "patrons who wish[ed] to travel between the bar and their seats [we]re forced -- as a recurring feature of the mode of operation -- to navigate in the dark through a crowd of dancing people holding plastic cups filled with liquid over a wooden floor." Id. Not so here. There is no evidence that TD Garden was dimly lit or employed "flashing strobe" or similar lighting or that its sports fans regularly jostled each other and caused spills. In fact, Raheb testified in his deposition that though the concourse was very busy, he was not greatly impacted in his ability to move through it.

We do not read Bowers as overruling or otherwise narrowing the explicit language of Sarkisian for several reasons. In Bowers itself, the SJC gave no such indication. To the contrary, Bowers cited Sarkisian approvingly several times throughout its opinion, including in support of its holding. See Bowers, 54 N.E.3d at 1091-97.

- 15 -

The Appeals Court of Massachusetts has not viewed Bowers as contrary to Sarkisian's explicit limitation. See Katin v. Stop & Shop Co., 92 Mass. App. Ct. 1129, 2018 WL 1074270 (Feb. 28, 2018) (issued pursuant to Mass. App. Ct. R. 23.0). In Katin, the plaintiff had slipped on a fallen advertising sign in the defendant's store that appeared to have fallen out of a steel display frame due to customer interference. Id. at *1. The Appeals Court recounted the specific facts of Sarkisian and found them distinguishable: "[u]nlike in Sarkisian, Stop & Shop's mode of operation did not create an inherent risk of the unsafe condition." Id. at *4. The plaintiff also "relie[d] heavily on Bowers." Id. The Appeals Court distinguished Bowers, saying:

> the store [in Bowers] had a "policy of having employees check the walkway whenever an employee was outside assisting a customer in the gravel area, or performing other work, approximately every fifteen minutes, at least in part due to concerns that stones might come to rest on the walkway as a result of customers walking in and around the gravel area." [Bowers, 485 Mass.] at 42. In light of this testimony, the Supreme Judicial Court determined that there was "a genuine question of material fact whether the risk of dislodged stones from customers walking in the gravel area in order to look at and select items for purchase was not just a 'conceivable' risk, but, rather, a recurring risk created by [the store's] mode of operation." Ibid.

Id. at *4. Katin is an unpublished decision, meaning that the court "determine[d] that no substantial question of law [wa]s presented by the appeal," which implicated both Sarkisian and Bowers. Mass. App. Ct. R. 23.0. Unpublished decisions "may be

- 16 -

cited for their persuasive value." Doe v. Sex Offender Registry Bd., 103 Mass. App. Ct. 1107, 2023 WL 6299409, at *2 (2023) (issued pursuant to Mass. App. Ct. R. 23.0).

Finally, we understand Bowers to be in line with the self-service retail operation case of Sheehan. In Bowers, the plaintiff argued that "Agway had notice that the stone was present because Agway uses a self-service gravel area as part of its daily operation, and was aware that customers walking in the area to pick up items for purchase might dislodge stones onto the walkway." Bowers, 54 N.E.3d at 1092 (emphasis added). This falls squarely in line with the plaintiff's mode-of-operation theory in Sheehan that a jury could find that the self-service grocery store had notice because it was aware that customers interacting with the grapes display spill grapes into the aisle. See Sheehan, 863 N.E.2d at 1279. In both cases, the retail defendants' display of products "regularly invite[d] . . . interference" by customers. Bowers, 54 N.E.3d at 1094 (quoting Sarkisian, 32 N.E.3d at 859)). Bowers exemplifies the risks inherent in self-service operations outlined in Sheehan, including that customers do not have the same incentives as a store owner to prevent hazards and so "may not be as careful" and that "customers often focus on displayed items that are arranged specifically to attract their attention, often making them unaware of what might be on the floor." Sheehan, 863 N.E.2d at 1282. Sarkisian expanded the mode-of-operation theory,

- 17 -

holding that in some instances the theory could apply outside the context of "self-service establishments" in which the SJC originally adopted it.  32 N.E.3d at 858.  But the court then limited its holding to make clear that this theory did not apply to all business enterprises that involve customers carrying their own drinks.  Id. at 859.  Bowers was decided in the self-service context, so Sarkisian's limitation was not directly relevant. Here, Raheb has sought to further expand the doctrine outside the self-service context, so the specific language of Sarkisian controls.

The entry of summary judgment for Delaware North is **affirmed**.  No costs are awarded.